Filed 5/12/14  In re R.H. CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.H., a Person Coming Under the Juvenile Court Law. | |
| MADERA COUNTY DEPARTMENT OF SOCIAL SERVICES/CHILD WELFARE SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>E.H.,<br><br>Defendant and Appellant. | F067623<br><br>(Madera Super. Ct. No. MJP016702)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Thomas L. Bender, Judge.

Gino de Solenni, under appointment by the Court of Appeal, for Defendant and Appellant.

Douglas W. Nelson, County Counsel, Miranda P. Neal and Woodrow C. Whitford, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

This case involves a biological father's due process rights.  He contends he was improperly deprived of a contested jurisdictional hearing because he was not advised of his rights under California Rules of Court, rule 5.682 and did not personally waive those

rights.  We agree.  We recognize that, given the evidence against him, Father may face a high hurdle in prevailing on the merits of his request for placement under Welfare and Institutions Code[1] section 361.2.  However, due process compels us to afford him the opportunity for a contested hearing.  Therefore, we will vacate and remand.

## INTRODUCTION

At a jurisdictional proceeding, "the court must advise the parents of their due process rights to a hearing and must obtain an express personal waiver of those rights if the hearing is to proceed without further evidence."  (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1374 (*Monique T.*).  See also Cal. Rules of Court, rule 5.682.[2])  In this case, the juvenile court did neither.  The Madera County Department of Social Services/Child Welfare Services (Department) concedes error, but contends it was harmless under *Monique T.*

While *Monique T.* found a similar error harmless under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), it did so because parent's counsel had explained the right to a contested hearing to her client.  (*Monique T.*, *supra*, 2 Cal.App.4th at p. 1378.)  We agree that when a parent is advised of his or her rights, reversal is not warranted merely because the advisement came from counsel rather than the court.[3]  But that is not what happened here.  In this case, there is no evidence that appellant was advised of his rights by the court, his counsel, or anyone else before his rights were waived at the jurisdictional hearing.  Therefore, we conclude the court's failures to advise appellant of his rights and obtain a personal waiver were not harmless.  Accordingly, we reverse the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Hereafter, "rule 5.682."

[3] A court's failure to comply with rule 5.682 is always error, but it may not be *reversible* error where the parent is fully advised of their rights through counsel.  (See *Monique T.*, *supra*, 2 Cal.App.4th at p. 1378.)

2.

jurisdictional and dispositional orders as to the placement of appellant's biological child, R.H.

## FACTS

Appellant Eric H. ("Father") is the biological father of minor R.H.[4]  R.H. has been the subject of at least two dependency proceedings.  The first proceeding began in 2011 and ended in 2012.  The second proceeding began in 2013 and is the subject of this appeal.

*2011 Dependency Proceedings*

In the 2011 proceedings, it was alleged that R.H.'s mother, Stacey F. ("Mother"), had been arrested for several alleged crimes, including willful harm or injury to a child in her care or custody.  (Pen. Code, § 273a, subd. (a).)  Mother claimed that Robert R. was R.H.'s father.[5]

At a jurisdictional hearing, the allegations were found true and the petition was sustained.  At the disposition hearing, the court declared R.H. and another child, Z.F., to be dependents of the court.  But the court allowed the Department to return R.H. and Z.F. to mother at its discretion.

Father's Letter

The record contains a letter, apparently written by Father to the juvenile court, dated April 28, 2011.  Father wrote that it had come to his attention that there was a child custody case involving R.H.  Father requested a DNA test to determine whether R.H. was

---

[4] From the 2011 proceeding through part of the 2013 proceeding, R.H. was referred to with a different last name, "M."  Eventually, Father requested her name be changed to R.H.  Ultimately, the juvenile court granted the request.  For simplicity, we refer to the child as R.H. throughout this opinion.

[5] Father's brief states that mother "told the Department that Jason M. was the father of R.H."  Our review of the record indicates that during the 2011 proceedings mother claimed Robert R., not Jason M., was the father of R.H.  The record indicates that it was not until the 2013 proceedings that mother claimed Jason M. was the father of R.H.

his biological child. The letter continued: "[I]f I am found to be the biological father of [R.H.] … it is my wish to raise her myself." Father enclosed an "Order for Genetic (Parentage) Testing" (Judicial Council Form FL-627), which he had completed.

He also stated that he was "indigent" and enclosed a form FW-001, Request to Waive Court Fees along with an income and expense declaration.

The letter states that because Father was incarcerated, he was not receiving copies of court documents in the case. He asked that the court allow him to participate in the case.

The court set a hearing to "review" the letter sent by Father requesting a paternity test. At the hearing, the court found that Father was no longer incarcerated and ordered the Department to "perform due diligence for [Father]." The Department did so and was unable to locate Father.

Nonetheless, Father appeared at a review hearing on June 7, 2011. The court granted father's request for genetic testing. But as of May 1, 2012, Father had still not reported for genetic testing.

Jason M. did submit to genetic testing. The results were filed with the court on February 3, 2012, and they indicated that Jason M. was not the biological father of R.H.

On October 30, 2012, the court dismissed the dependency proceedings.

*2013 Dependency Proceedings*

In March 2013, the Department filed a section 300 petition involving Z.F., R.H. and newborn S.T. The petition alleged that S.T. had been born four days earlier and tested positive for methamphetamine. Mother also tested positive for methamphetamine.

The petition also alleged that S.T.'s father, Charles T., had admitted to smoking marijuana in the home where S.T. was born, one hour before her birth. Z.F. and R.H. were allegedly present in the home while Charles T. smoked marijuana. The petition alleged all three children faced substantial risk of serious physical harm and/or neglect due to Mother's substance abuse.

4.

One of the Department's subsequent reports indicated that hair follicle samples were taken of Mother, Charles T., Z.F. and R.H. on March 19, 2013. All four individuals tested positive for amphetamines and methamphetamine.

In the 2013 proceedings, Mother claimed Jason M. was the father of R.H. But, she admitted that Jason M. "was not present at the birth, is not listed on the birth certificate, [and] has never lived with her and the minor."[6]

The Department's detention report discloses no effort to contact Father or notify him of these proceedings. The report indicated that the three children had been placed together in a foster home. The Department requested that the children remain in out-of-home care pending further order of the court. The children were ultimately placed together in a foster home.

At the detention hearing on March 20, 2013, the court found: "Continuance of the child [*sic*] in the home of the parents, is contrary to the child's welfare and: There is substantial danger to the physical health of the child [*sic*], or the child is suffering severe emotional damage and there are no reasonable means to protect the child's physical or emotional health without removing the child from the parent's physical custody." The court ordered the children detained and provided that the Department could temporarily place them in a suitable relative's home, foster home, or group home.

A report by the Department indicates that on March 25, 2013, Father came in to the Department's office to speak with the social worker for R.H.'s case. The receptionist indicated that Father was being "demanding." The social worker spoke with Father. Father was "mad" that no one at the Department knew where his daughter was. Father conveyed that he was R.H.'s biological father as demonstrated by the genetic testing. Also, father referenced a child support order. He also said he had visited with R.H. three

---

[6] Mother also claimed that Jason M. had never submitted to genetic testing. However, as noted above, results of Jason M.'s testing had been filed over a year prior.

weeks prior. Father requested a visit with R.H. The social worker told Father that there was a court hearing scheduled for April 9, 2013. Father said he did not want to wait and would file papers with the court sooner. Father said he did not know why Mother did not try to keep R.H. out of foster care by telling the social worker that he was R.H.'s father. Father told the social worker that if Mother would not protect R.H. from foster care, he would. The social worker said she needed to contact Child Support Services to "get the records" – presumably referring to the child support order Father had mentioned. The social worker gave Father her business card. Father delivered the child support order to the Department later that day. The social worker said Father was "agitated" and speaking quickly.

On March 26, 2013, the Department received a call from the Madera Police Department indicating that Father was complaining the Department was keeping him from seeing R.H. The same day, the Department received a call from the Madera Sheriff's Department indicating that Father "was at their office regarding his child, [R.H.], being placed in foster care." Unidentified staff at the sheriff's department said Father was agitated and "appeared to be under the influence of a controlled substance."

On March 26, 2013, the social worker met with Mother and Charles T. The social worker conveyed the results of the March 19, 2013, hair follicle tests. Mother and Charles T. expressed "shock[]" because they claimed not to have used methamphetamine. They said that Father "had been coming to their home and was buying them and the kids' drinks and he must have been putting methamphetamine in the drinks." They said that Father "slams meth," prompting the social worker to ask why they would let Father around their daughter. The social worker also told them that the levels of methamphetamine found in R.H.'s sample were not consistent with their theory. The Department concluded both Mother and Charles T. "were in denial."

On March 28, 2013, Mother and Charles T. failed to come to a scheduled visitation with their children.

6.

*April 9, 2013, Hearing*

At a hearing on April 9, 2013, the court appointed counsel for Father. The court set the jurisdictional hearing for Thursday, April 11, 2013. The court told Father that his appointed counsel is "difficult to reach" because "he's a solo practitioner and he's in court quite a bit." The court told Father that if he could not reach him, "just know that you will be able to talk to him on Thursday."

Later, still during the April 9 hearing, Father informed the court that he had been trying to obtain support for R.H. through Social Security because he is disabled. Father obtained an order from another department of the court which contained mother's social security number. He obtained the order so that he could "get[] her support through my Social Security benefits." Father also explained he was frustrated with "CPS" because their records should have reflected that he was R.H.'s biological father, considering the genetic test results were filed in court.

The court informed Father that if he wanted placement of R.H., he would have to be assessed and that a home inspection would have to occur. Father said he had "a beautiful home."

*April 11, 2013, Hearing*

The jurisdictional hearing proceeded as planned on April 11, 2013. The court asked Father's counsel whether Father would be submitting on the Department's report. Counsel replied: "Your Honor, for the record, I was appointed Tuesday. [Deputy County Counsel] worked quickly to serve me with – serve me with scanned copies of all the documents in the case thus far, which I did review. *I was able to meet with [Father] in the hallway before the Court called the case*, and we do not have an issue with the court taking jurisdiction based on these allegations." (Italics added.) The court did not advise Father of his right to a contested jurisdictional hearing. (See Cal. Rules of Court, rule 5.682.) Nor did Father personally waive his right to a contested jurisdictional hearing. (See *ibid*.)

7.

The court set the dispositional hearing for April 25, 2013. The court told Father, "we'll be looking at … the issues regarding you and your daughter [R.H.], and resolving those issues when you come back."

The court then adopted the Department's recommended findings and orders, including an order that the children "shall remain in the temporary care and custody of the … Department for placement in a suitable relative[’s] home, foster home or group home."

*Motion for Continuance*

Father told the social worker that he had been preparing his home for placement of his daughter. He requested the home assessment occur on May 6, 2013. The Department requested a continuance of the dispositional hearing so that the home assessment could occur.

*Disposition Report*

Social Worker's Meeting With Father

According to the Department's disposition report, a social worker met with Father on April 29, 2013, to attempt to assess him for placement of R.H. The report indicated that Father "has expressed that he wants his child, [R.H.], but has been uncooperative with this Department in our attempts to assess him as a non-custodial parent." Father disclosed that he has a history of methamphetamine use. However, he indicated that he received treatment for the abuse. Father declined to submit to a hair follicle drug test.

The social worker attempted to conduct an Addiction Severity Index assessment of Father. However, Father became angry and began yelling at the social worker. Father complained he had not been notified immediately when his daughter was taken from her mother. He said "he would not 'go through the hoops' to get his daughter because he had not done anything wrong."

Father also disclosed that he is bipolar, psychotic and has "manic disorder." He said he has been prescribed medication for the disorders but does not take the medication.

8.

Criminal History

The dispositional report says that the social worker contacted the Department of Justice (DOJ) regarding Father's criminal records on March 26, 2013. The DOJ reported that Father's "criminal records were too long to read them all over the telephone." The DOJ staff said they would provide the last two "charges" over the phone and mail the entire criminal history to the Department. The report then lists the two charges. However, notations after the charges suggest that some or all of the charges were dropped or dismissed. It is unclear why the charges related to the March 27, 2010, entry were "dismissed." Considering the very serious nature of these charges, the reason for dismissal seems particularly relevant. The list reads:

> "**09/12/2011**
> "Inflicted Corporal Injury on Spouse
> "Detention
> "Dropped Lack of Sufficient Evidence
>
> **"03/27/2010**
> "Murder in the First Degree
> "Child Cruelty
> "Violation of Parole
> "Felony
> "- Assault with a Deadly weapon (not Firearm)
> "- Great Bodily injury on Police officer/firefighter
> "- Obstruct/ Resist Executive Officer
> "- Obstruct police officer
> "Dismissed in court 4 counts."

As of May 8, 2013, the Department had still not received Father's criminal history from the DOJ.

*Dispositional Hearings*

May 9, 2013

On May 9, 2013, Father's counsel requested a contested dispositional hearing. The grounds for requesting a contested hearing were twofold. First, when it was confirmed that the Department was recommending no services be provided to Father,

9.

counsel said he was "[o]bviously, not agreeable." Counsel also raised the issue of placement of R.H. with Father, and said he would "look[] into the evidence and arguments that we have in support of that position." The court responded, "Yeah, I need to set a contested hearing." Accordingly, the court scheduled a contested dispositional hearing for June 6, 2013.

The Department asked the court to order Father to submit to a hair follicle drug test. The court explicitly declined to do so.

June 6, 2013

At the June 6, 2013, hearing, the Department announced that it had changed its position and now agreed to recommend that Father receive services. The dispositional hearing was continued to June 27, 2013.

June 27, 2013

At the June 27, 2013, hearing, Father's counsel told the court they had "settled the contest by the department agreeing to offer [services] to [Father]."[7] The dispositional hearing was continued again to July 11, 2013.

July 11, 2013

The dispositional hearing ultimately occurred on July 11, 2013. Though Father had attended all prior dispositional hearings, he was inexplicably absent on July 11, 2013. Father's counsel submitted on the report "with comment" on an unrelated issue regarding the Department's recommended services. The issue of R.H.'s placement was not raised. Each counsel eventually submitted on the Department's report. The court then adopted the Department's recommended findings and orders. The court found Father was not a

---

[7] The record is not clear on why Father's counsel viewed the "contest" as "settled." The reasons for requesting a contested hearing were (1) Father disagreed with the recommendation not to provide him services and (2) Father wanted R.H. placed with him. The Department addressed the first concern at the June 6, 2013, by agreeing to recommend services for Father. But the record shows no resolution of Father's objections to R.H.'s placement outside his home.

presumed father under the Family Code, but did provide him with services. The court declared R.H. a dependent of the court and removed her from the custody of Mother. The Department was permitted to place R.H. "in any suitable placement in conformity with applicable legal requirements."

Father appeals from the jurisdictional and dispositional orders.

## DISCUSSION

Father claims the court violated his due process rights by failing to advise him of his rights under rule 5.682, including the right to a contested jurisdictional hearing. (Rule 5.682(b)(1).) The Department concedes error, but argues it was harmless. We accept the Department's concession for the reasons explained below. Thereafter, we will analyze whether the conceded error was prejudicial. We ultimately conclude the Department has failed to show that the error was harmless.[8]

A. Due Process in Jurisdictional Proceedings

Procedural due process analysis involves two steps. First, we determine whether a right to due process exists in a particular context. Then, we decide what procedures satisfy the requirements of due process. (See *Caloca v. County of San Diego* (1999) 72 Cal.App.4th 1209, 1218.)

      1. The Right to Due Process Applies in the Context of Jurisdictional
         Hearings

Our Supreme Court has plainly held that due process protections apply to jurisdictional hearings. "Although a jurisdictional finding in a section 300 proceeding does not necessarily lead to a termination of parental rights, it is the first step in the

---

[8] Father also contends the court erroneously failed to grant him *Kelsey S.* status. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).) Because we reverse on the failure to hold a contested jurisdictional hearing and remand for the presentation of Father's evidence, this contention is moot.

11.

termination process and must be protected by due process guaranties." (*In re Lucero L.* (2000) 22 Cal.4th 1227, 1247.)

>2. Due Process Confers a Right to "Trial" on Issues Raised by the Section 300 Petition

"[O]nce it has been concluded that a due process right exists we … decide what process is due. [Citation.]" (*In re Malinda S.* (1990) 51 Cal.3d 368, 383, superseded by statute on another point as stated in *People v. Otto* (2001) 26 Cal.4th 200, fn. omitted.)

Identifying the dictates of due process generally requires consideration of several factors, including "the private interest that will be affected by the official action [and] … the [dignity] interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story .…" (*In re Malinda S.*, *supra*, 51 Cal.3d at p. 383. See also *People v. Ramirez* (1979) 25 Cal.3d 260, 269.) In section 300 proceedings, parents have "substantial private interests at stake" and "significant dignity interests in being fully and fairly able to present their sides." (*In re Malinda S.*, *supra*, 51 Cal.3d at p. 383.) Therefore, due process imposes several requirements in the context of jurisdictional hearings. "Among the essential ingredients of due process are the right to a trial on the issues raised by the petition, the right to confront and cross-examine witnesses, and to compel the attendance of witnesses. [Citation.]" (*Monique T.*, *supra*, 2 Cal.App.4th at p. 1377.)

>3. Waiver

Like many constitutional rights, the right to a contested dependency hearing can be waived. (See *In re Shelley J.* (1998) 68 Cal.App.4th 322, 328.) But, such waivers must be knowing and voluntary. The Court of Appeal explained this concept in the analogous context of termination of parental rights:

>"Because parents enjoy a fundamental liberty interest in the care, custody and control of their children, parental rights cannot be terminated except according to procedures that satisfy due process. [Citation.] At the same time, constitutional rights may generally be waived, provided the waiver is

12.

knowing, voluntary, and intelligent. [Citation.]" (*Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 545–546.)

The California Rules of Court also require certain specific advisements be given at a jurisdictional hearing. (Rule 5.682(b).) Among the rights that must be explained to the parent is the right to a contested hearing. (Rule 5.682(b)(1).) Once advised of these rights, the parent has the option to "submit the jurisdictional determination to the court based on the information provided to the court and waive further jurisdictional hearing." (Rule 5.682(e).) After such a submission, the court "must" find, inter alia, that the parent (1) "has knowingly and intelligently waived the right to a trial on the issues by the court …"; (2) "understands … the possible consequences of … submission"; and (3) has entered the submission "freely and voluntarily." (Rule 5.682(f)(3)–(5).)

The parent must personally waive these rights; the representations of counsel alone will not suffice. (See *Monique T.*, *supra*, 2 Cal.App.4th at p. 1377.) Thus, when a juvenile court does not explain the parent's rights or obtain a personal waiver from the parent, it is error to accept a waiver "based only on counsel's representations." (*Ibid.*)

Here, the juvenile court did not explain Father's rights under rule 5.682, nor did Father personally waive those rights. Instead, the court accepted a waiver "based only on counsel's representations." (*Monique T.*, *supra*, 2 Cal.App.4th at p. 1377.) This was error.

### a. Harmless Error Analysis

The Department concedes error, but contends it was harmless. In its brief treatment of the prejudice issue, the Department relies entirely on *Monique T.*, *supra*, 2 Cal.App.4th 1372.

### 1. *Monique T.*

In *Monique T.*, the court similarly failed to give mother the advisement of trial rights set forth in what is now rule 5.682. Moreover, the court failed to obtain a waiver from the mother of her trial rights. However, the trial court in *Monique T.* did have the following exchange with the mother's counsel:

13.

" 'The Court: Are the reading of the petition and advice of rights waived, Ms. Gonella [mother's counsel]?

" 'Ms. Gonella []: Yes, they are waived, and at this time we're prepared to submit the matter on the petition with the knowledge that the Court will almost undoubtedly find jurisdiction in this case.

" 'The Court: All right, and you have explained to your client and are satisfied that she understands she's giving up her rights to have other evidence presented and to have a contested matter?

" 'Ms. Gonella: Yes, Your Honor, and I've also explained to her if the child is not returned to her care in one year, she runs the risk of losing her rights as a parent with the child.' " (*Monique T.*, *supra*, at p. 1376.)

Nonetheless, the appellate court concluded: "Because the juvenile court did not explain the rights to the mother as required nor did it obtain her personal waiver of these due process rights, we conclude it was error to accept a waiver of these rights based only on counsel's representations." (*Monique T.*, *supra*, 2 Cal.App.4th at p. 1377.)

The appellate court proceeded to analyze harmlessness under the "beyond a reasonable doubt" standard of *Chapman*. (*Monique T.*, *supra*, 2 Cal.App.4th at pp. 1377–1379.)[9] The court ultimately found the error harmless, stating: "mother was represented,

_____

[9] We question whether constitutional errors in section 300 cases should be reviewed under the *Chapman* standard of harmlessness. With respect to dependency cases generally, it may be more appropriate for the appellate harmlessness standard to reflect the "clear and convincing" burden of proof below. (Cf. *Haddad v. Lockheed California Corp.* (9th Cir. 1983) 720 F.2d 1454, 1458–1459 [standard of harmlessness on appeal should mirror burden of proof at trial].) With respect to the specific error presented here, we wonder whether harmless error analysis applies at all. (But cf. *In re James F.* (2008) 42 Cal.4th 901, 915–916.) When the record is *completely* silent on required advisements and personal waiver of the right to a contested hearing, we cannot "quantitatively assess … [the] error in the context of other evidence presented" (*In re Angela C.* (2002) 99 Cal.App.4th 389, 394) because only one side has presented evidence. This issue may be ripe for review by the Supreme Court in the appropriate case. In the meantime, we will follow our own precedent identifying *Chapman* as the proper standard for constitutional errors in section 300 cases. (*In re Angela C.*, *supra*, at pp. 393–394.) Moreover, we note that the Department does not argue that the *Chapman* standard does not apply. To the contrary, it relies solely on *Monique T.*, which applied *Chapman*.

at all stages of the proceeding, by an attorney, *who explained her rights to her* and who indicated that she desired to waive them." (*Monique T.*, *supra*, at p. 1378, italics added.)

The Department contends that the present error is harmless because, as in *Monique T.*, father "had an appointed attorney and was present at the time that the court found [j]urisdiction." However, unlike in *Monique T.*, the Department here does not cite, and we do not find, anything in the record indicating that counsel explained to Father his right a contested jurisdictional hearing.

Thus, the Department has failed to show the error was harmless under *Monique T.*

### 2. Father Failed to Show Prejudice

Father argues that the error was prejudicial because he was deprived of the opportunity to establish that he was a *Kelsey S.* father. This, in turn, prevented him from obtaining placement of R.H. under section 361.2. The Department argues that even if Father had been able to attain *Kelsey S.* status, he would still not be entitled to placement under section 361.2. We will analyze this contention, beginning with a brief description of the statute.

### a. Section 361.2

The purpose of section 361.2 is to "guide[] the court and the Agency in determining the child's placement" once the child is removed from the custodial parent. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1422.)[10] Its provisions apply when the juvenile court first takes jurisdiction of a child. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 315.)

Section 361.2, subdivision (a) provides: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a [noncustodial parent] … who desires to assume custody of the child." (§ 361.2, subd. (a).) "If [the noncustodial] parent requests custody, the court shall place the child with the parent

---

[10] Of course, other statutes are involved in this determination as well.

15.

unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) This finding of detriment must be based on "clear and convincing" evidence. (*In re Z.K.* (2011) 201 Cal.App.4th 51, 70.) "In the absence of a finding of detriment, the court must place the child with the noncustodial parent. [Citation.]" (*In re V.F.* (2007) 157 Cal.App.4th 962, 970, undermined by statute on another point as stated in *In re Adrianna P.* (2008) 166 Cal.App.4th 44.)

The Department persuasively argues that even if Father were afforded *Kelsey S.* or presumed father status, he would not be entitled to placement under section 361.2 because there was clear and convincing evidence of detriment. The Department cites an extensive array of evidence: Father's criminal record, history of drug use, expressions of anger, mental health issues, and lack of a stable plan for residency.

But the persuasiveness of the Department's position is unsurprising because Father presented no contrary evidence. And Father presented no contrary evidence because there was no contested hearing. It would be specious reasoning to hold that the deprivation of Father's right to present evidence was harmless because of the weight of the unchallenged evidence. The fact that the evidence against Father went unrebutted does not support a finding of harmlessness.

In sum, Father was unable to present his side of the story. It may be that he has an unconvincing story to tell, but procedural due process requires that we hear it nonetheless.

### 3. Burden of Persuasion Rests with the Department

Under *Chapman*, the Department bears the burden of persuasion on the issue of prejudice. "Certainly error, constitutional error … casts on someone other than the person prejudiced by it a burden to show that it was harmless." (*Chapman*, *supra*, 386

U.S. at p. 24.) It has not carried that burden.[11] Therefore, we cannot conclude that the court's error was harmless beyond a reasonable doubt and are compelled to reverse.

*Directions*

On remand, the court shall advise Father of his rights under rule 5.682. Assuming Father elects to present evidence at a contested hearing, the court shall thereafter determine whether Father is entitled to elevated fatherhood status and whether he is entitled to placement of R.H. under section 361.2.

## DISPOSITION

The jurisdictional and dispositional findings and orders are reversed as to Father and the placement of R.H. The matter is remanded to the juvenile court.


_____

Poochigian, Acting P.J.

WE CONCUR:


_____

Peña, J.


_____

Sarkisian, J.*

---

[11] It is doubtful whether the Department could ever carry its burden in a "silent record" case like this. Again, we question, without deciding, whether the error presented here is subject to harmless error analysis at all. (See fn. 9, *ante*.)

* Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.